JUDGE PAULEY

PREET BHARARA
United States Attorney for
the Southern District of New York

By:   CAROLINA A. FORNOS
      HARRY A. CHERNOFF
      JASON H. COWLEY
      Assistant United States Attorneys
      One St. Andrew's Plaza
      New York, New York 10007

13 CV 3028

JAMES M. KOUKIOS
MARIA GONZALEZ CALVET
United States Department of Justice
Criminal Division, Fraud Section


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA                :

            - v. -                      :   **VERIFIED COMPLAINT**

ALL RIGHT, TITLE, AND INTEREST          :
IN THE ASSETS OF CARTAGENA                  13 Civ.
INTERNATIONAL, INC.; ETC                :
INVESTMENT(S) S.A.; H.A.S.
INVESTMENT GROUP S.A.; CASTILLA         :
HOLDINGS S.A.; and HYSEVEN S.A.;
INCLUDING BUT NOT LIMITED TO THE        :
ASSETS IN THE ACCOUNTS LISTED IN
SCHEDULE A;                             :

ALL RIGHT, TITLE, AND INTEREST          :
IN THE ASSETS LISTED IN SCHEDULE
B; and                                  :

ALL RIGHT, TITLE, AND INTEREST          :
IN THE REAL PROPERTY LISTED IN
SCHEDULE C; TOGETHER WITH ALL           :
IMPROVEMENTS AND APPURTENANCES
THERETO,                                :

            Defendants-in-rem.          :
- - - - - - - - - - - - - - - - - -x

Plaintiff United States of America, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, for its complaint alleges as follows:

## I. NATURE OF THE ACTION

1.   This is an action by the United States of America seeking forfeiture of:

> a.   All right, title, and interest in all of assets of the following entities: Cartagena International, Inc. ("Cartagena"), ETC Investment(s) S.A.[1] ("ETC Investments"), H.A.S. Investment Group S.A. ("H.A.S. Investment Group"), Castilla Holdings, S.A. ("Castilla"), and Hyseven S.A. ("Hyseven")(collectively, the "Money Laundering Entities"), including but not limited to all assets in the accounts of these entities listed in Schedule A (the accounts in Schedule A, collectively, the "Target Accounts");

> b.   All right, title, and interest in the assets set forth in Schedule B (the "Additional Target Funds"); and

> c.   All right, title, and interest in the real property listed in Schedule C; together with all improvements and appurtenances thereto (collectively, the "Target Properties");

(collectively, the "Defendant Property").

The Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in or traceable to money laundering, attempted money laundering, and conspiracy to

---

[1] This entity is at times referred to as "ETC Investment SA" and also as "ETC Investments SA." For purposes of this complaint, this entity is referred to as "ETC Investments."

commit money laundering; and pursuant to 18 U.S.C. § 981(a)(1)(C) as property constituting or derived from proceeds traceable to violations of the Foreign Corrupt Practices Act and the Travel Act.

## II. JURISDICTION AND VENUE

2.     This Court has jurisdiction pursuant to Title 28, United States Code, Sections 1345 and 1355.

3.     Venue is proper under Title 28, United States Code, Section 1355(b)(1)(A) because actions giving rise to forfeiture took place in the Southern District of New York.

## III. PROBABLE CAUSE FOR FORFEITURE

4.     On March 12, 2013, a criminal complaint (the "Complaint" or "Compl.") was filed under seal in the United States District Court for the Southern District of New York charging Tomas Alberto Clarke Bethancourt ("Clarke") and Jose Alejandro Hurtado ("Hurtado") with conspiring to violate the Foreign Corrupt Practices Act (the "FCPA") in violation of 18 U.S.C. § 371 (Count 1), and with respective substantive violations of the FCPA in violation of 15 U.S.C. § 78dd-2 (Counts 2 and 3).  The Complaint also charged Clarke, Hurtado, and Maria De Los Angeles Gonzalez de Hernandez ("Gonzalez") with conspiring to violate the Travel Act in violation of 18 U.S.C. § 371 (Count 4), and respective substantive violations of the Travel Act in violation of 18 U.S.C. § 1952(a)(3)(A) (Counts 5 and 6).  The

Complaint also charged Clarke, Hurtado, and Gonzalez with conspiring to commit money laundering in violation of 18 U.S.C. § 1956(h) (Count 7), and with respective substantive counts of money laundering in violation of 18 U.S.C. § 1956(a)(2)(A) (Counts 8 and 9).  The Complaint, attached hereto as Exhibit A, is fully incorporated herein by reference.

## OVERVIEW OF THE CRIMINAL CONDUCT

5.  The Complaint alleges that Clarke and Hurtado were affiliated with a brokerage firm registered with the U.S. Securities and Exchange Commission (the "SEC") and with its principal place of business in New York, New York (the "Broker-Dealer").  Compl. ¶ 17.

6.  The Complaint further alleges that since approximately June 2008, Gonzalez served as either the Vice President of Finance or Executive Manager of Finance and Funds Administration of Banco de Desarrollo Económico y Social de Venezuela ("BANDES").  Compl. ¶ 18.  BANDES is the state-owned and state-controlled economic development bank of the Bolivarian Republic of Venezuela, operated under the direction of the Venezuelan People's Ministry of Planning and Finance.  Compl. ¶¶ 16, 18.  According to the Complaint, BANDES acted as the financial agent of the Venezuelan government in order to promote economic and social development, serve as the trustee for agencies of the public sector, and support the expansion and

diversification of Venezuela's infrastructure.  Compl. ¶ 16.

7.    The Complaint alleges that Clarke and Hurtado, along with others known and unknown, directed kickback payments to Gonzalez in exchange for Gonzalez steering BANDES business to the Broker-Dealer and authorizing BANDES to execute bond trades with the Broker-Dealer.

8.    As set forth in the Complaint, the payments to GONZALEZ represented a portion of the monies generated by the Broker-Dealer's bond trading activity in connection with BANDES. During this time period, with GONZALEZ acting as the authorized trading contact in regard to the Broker-Dealer and managing the relationship between BANDES and the Broker-Dealer, BANDES directed substantial business to the Broker-Dealer and carried out bond transactions that generated tens of millions of dollars in revenue for the Broker-Dealer.  Compl. ¶ 21.

9.    As part of the scheme alleged in the Complaint, Hurtado and Hurtado's spouse ("Hurtado's Spouse") received millions of dollars from the Broker-Dealer in the form of salary, bonus payments, and finders fees, that were generated from revenue the Broker-Dealer generated in connection with its business with BANDES.  Hurtado, in turn, conveyed a portion of these funds back to Gonzalez.  Compl. ¶ 22.  Also as part of this scheme alleged in the Complaint, the Broker-Dealer sent millions of dollars of BANDES-related revenue to a foreign entity

controlled by Clarke, ETC Investments, with Clarke further transferring a portion of these funds on to Cartagena, an entity owned jointly by Gonzalez and an associate of hers ("Associate 1"). <u>Id.</u>[2]

10.   In order to promote this bribery scheme, Clarke and Hurtado, and others known and unknown, including Gonzalez, conspired to transmit, and in fact transmitted funds, constituting kickback payments, from accounts inside the United States to accounts outside of the United States.

11.   As set forth in the Complaint, Clarke, Hurtado, and Gonzalez utilized middlemen and intermediary corporate entities, including ETC Investments and Cartagena, among others, to launder these illicit payments to Gonzalez. Compl. ¶ 23.

12.   Additionally, as set forth below, payments were made to another employee of BANDES ("CC-1") as part of the scheme.  Payments were laundered to CC-1 through another corporate entity, Hyseven, which also held accounts in Switzerland.

13.   Finally, Hurtado, among others, derived millions of dollars of profit from his role in the scheme and used certain of those proceeds to purchase real estate in the Miami, Florida area (collectively, the Target Properties, set forth in Schedule

---

[2] Cartagena is referred to in the Complaint as the "Gonzalez Company."  Compl. ¶ 22.

C).

## HURTADO UTILIZES THE H.A.S. INVESTMENT GROUP AND CARTAGENA TO LAUNDER FUNDS TO GONZALEZ

14.   According to the Complaint, Hurtado directed at least $2,028,541 to Gonzalez as part of the scheme.  Compl. ¶ 36(c).

15.   In regard to specific transfers, as set forth in the Complaint, Hurtado, pursuant to Gonzalez's direction, wired $509,250 to an account in Switzerland held in the name of Associate 1. Compl ¶¶ 34(b) and 35.  Hurtado transferred these funds in the United States through a correspondent account located in New York, New York for further transfer to Switzerland. Id.  Specifically, on or about July 21, 2009, Hurtado caused to be wired from the United States $509,250 to account # 707-3860 at Bank Hapoalim (Switzerland), held in the name of Jorge Hernandez Gonzalez (the "Jorge Gonzalez Account").

16.  Wire records indicate that Hurtado utilized a company he controls, the H.A.S. Investment Group, to launder funds originating from the Broker-Dealer in New York, New York to Gonzalez.  Specifically, bank records indicate the following transactions were made:

a.   Between in or about June 2009 and in or about August 2009, Hurtado and/or Hurtado's Spouse received at least $8.7 million in payments from the Broker-Dealer in New York, New York in accounts controlled by one or both of them in the United

-7-

States.

   b. On or about November 12, 2009, approximately $5,000,000 was transferred from accounts in the United States controlled by Hurtado and/or Hurtado's Spouse to account # 506877 at Mirabaud & Cie in Switzerland, held in the name of H.A.S. Investment Group S.A. (the "Second H.A.S. Investment Account").[3]

   c. On or about December 11, 2009, approximately $1,424,867 was transferred from the Second H.A.S. Investment Account to account # 0305.2492 at Bank Julius Baer & Co. Ltd. in Switzerland, held in the name of Cartagena International, Inc. (the "First Cartagena Account").

   17. An email sent by Hurtado approximately nine days earlier, on or about December 2, 2009, to Clarke and another employee of the Broker-Dealer stated, in relevant part (translated from Spanish):[4]

   Gentlemen,

   Here I'm sending the coordinates where Mary wants her money sent.

   Regards

---

[3] Email correspondence from August and September 2009 also indicates that the H.A.S. Investment Group originally held account # 506761 at Mirabaud & Cie in Switzerland (the "First H.A.S. Investment Account").

[4] Translations of emails written in Spanish were prepared by a translator who has certified that he or she is competent to conduct such translations and further certified under penalty of perjury that the translations are true and correct.

Alejandro Hurtado

Attached to the email was a document referencing the First Cartagena Account.

## CLARKE AND OTHERS UTILIZE ETC INVESTMENTS, CASTILLA, AND CARTAGENA TO LAUNDER FUNDS TO GONZALEZ

18.   According to the Complaint, Clarke directed multiple payments to Gonzalez as part of the scheme.  Compl ¶¶ 37-40.

19.   Clarke primarily laundered funds that originated from the Broker-Dealer in New York, New York to Gonzalez through ETC Investments, a foreign entity he controlled.  As set forth in the Complaint, the Broker-Dealer in New York, New York paid several million dollars in purported finder's fees to both a Panamanian resident, identified as "Associate 2" in the Complaint, and ETC Investments, of which Associate 2 was designated as president.  Compl. ¶ 38(b).

20.   These payments were often sent to, or deposited in, ETC Investments accounts in Switzerland.  For example, bank records reflect the following transactions, which are also set forth in the Complaint (see id.):

a.   On or about September 29, 2009, the Broker-Dealer in New York, New York, sent two wire transfers in the amounts of approximately $2,002,983 and $2,048,206, respectively, to account # 506712 at Mirabaud & Cie in Switzerland, held in the name of ETC Investment(s) S.A. (the

-9-

"First ETC Investments Account").

        b.    On or about January 21, 2010, the Broker-Dealer issued two checks in the amounts of approximately $2,829,585 and $1,920,531, respectively, to ETC Investments. These checks were issued from the Broker-Dealer in New York, New York, and, as reflected on stamps appearing on the back of the checks, were deposited into Mirabaud & Cie, the bank at which the First ETC Investments Account is held.

        c.    On or about May 4, 2010, the Broker-Dealer in New York, New York issued a check for approximately $2,500,000 to Associate 2.

        d.    On or about May 18, 2010, this check was deposited into the First ETC Investments Account.

        21.    In total, at least $15 million was transferred from the Broker-Dealer in New York, New York to accounts held by ETC Investments.

        22.    In addition to the First ETC Investments Account, documents indicate that additional accounts held by ETC were involved in the scheme.  For example, in or about late June or early July 2009, Clarke emailed another Broker-Dealer employee account information for account # 03-24-01-051488-1 at Banco General S.A. (in Panama), held in the name of ETC Investment S.A. (the "Second ETC Investments Account").  Records indicate that on or about July 1, 2009, the Broker-Dealer attempted to wire

approximately $1,376,887 to the Second ETC Investments Account, though the wire, upon information and belief, was unsuccessful.

23.   Clarke, working with others, transferred a portion of the funds deposited into ETC Investments accounts to Cartagena accounts in Switzerland.  For example, bank records reflect the following transactions, which are also set forth in the Complaint (see Compl. ¶ 40):

a.   On or about April 19, 2010, approximately $883,488 was wired from the First ETC Investments Account to account # 1.254.710-027 at Rahn & Bodmer Co. in Switzerland, held in the name of Cartagena International, Inc. (the "Second Cartagena Account").

b.   On or about May 6, 2010, approximately $700,000 was wired from the First ETC Investments Account to the Second Cartagena Account.

c.   Attached to an email sent to Clarke on or about August 4, 2010, were instructions requiring a signature to authorize the transfer of $900,000 from account # 7993-4 at CBH Bank (which, upon information and belief, refers to CBH Compagnie Bancaire Helvétique SA, a Swiss financial institution), held in the name of ETC Investment(s) (the "Third ETC Investments Account"), to the Second Cartagena Account.

24.   An email that Hurtado sent to Clarke and another employee of the Broker-Dealer on or about April 9, 2010,

indicated that Gonzalez also maintained additional Cartagena accounts at the same Swiss financial institution to receive payments in euros and securities as part of the scheme.  The subject line of the email read: "Instrucciones Cartagena + Hyseven."  In the email, Hurtado stated (translated from Spanish):

> Guys, here you have the instructions from la hormiga and parchita[.][5]
>
> Hugs
>
> AH

Attached to this email were two documents, including a document titled: "Transfer-EUR-USD-Cartagena.pdf."

25.  This attached document referenced three accounts as follows:

a.  Under the headings "Cash:" and "EUR," the attachment referenced account # 1.254.710-019 at Rahn & Bodmer Co. (in Switzerland), held in the name of Cartagena International, Inc. (the "Third Cartagena Account").

b.  Under the headings "Cash:" and "USD," the attachment referenced the Second Cartagena Account.

---

[5] According to the translation, the terms "la hormiga" and "parchita" translate literally to the "ant" and the "passion fruit."  Upon information and belief, Hurtado is referring to Gonzalez and CC-1 when using these terms.

c.   Under the headings "Securities:" the attachment referenced account # 1.254.710-701 at Rahn & Bodmer Co. (in Switzerland) (the "Fourth Cartagena Account").

26.   Wire transfer instructions emailed to Hurtado identify an additional account in Switzerland held by Cartagena, specifically, account/IBAN[6] # CH9208762000810500001 at CBH Compagnie Bancaire Helvétique SA (in Switzerland), held in the name of Cartagena International, Inc. (the "Fifth Cartagena Account").   Additionally, as referenced in the Complaint (Compl. ¶ 42(c)), on or about September 14, 2011, Gonzalez received approximately $42,600 into an account she maintains in the United States that was sent from the Fifth Cartagena Account.

## Use of Castilla to Launder Funds to Gonzalez

27.   As set forth in the Complaint, funds from the Broker-Dealer in New York, New York were laundered to Gonzalez not only directly through ETC Investments, but also from ETC Investments, through a Swiss account held by another entity (referred in the Complaint as the "Intermediary Swiss Account"), and from that account on to Cartagena.   Compl. ¶ 40(c). Specifically, on or about May 24, 2010, another individual, identified as "Associate 3" in the Complaint, sent an email to

---

[6] "IBAN" stands for International Bank Account Number.   The IBAN is an internationally agreed upon means of identifying bank accounts across national borders.   It consists of a two-letter country code, two check numbers (such as the sum of previous numbers) and a country-specific bank account number.

Clarke attaching for Clarke's signature an authorization to transfer $1,550,000 from the First ETC Investments Account to an account held in the name of Castilla Holdings S.A. at the same bank (referred to in the Complaint as the "Intermediary Swiss Account"). Then, on or about June 4, 2010, bank records reflect that $1,550,000, the same amount, was transferred from account # 504919 at Mirabaud & Cie in Switzerland, held in the name of Castilla Holdings S.A. (the "Castilla Account"), to the Second Cartagena Account.

### CC-1 RECEIVED KICKBACK PAYMENTS IN A SWISS ACCOUNT HELD IN THE NAME OF HYSEVEN

28. In addition to Gonzalez, another employee of BANDES, CC-1, received illicit payments as part of the scheme described in the Complaint. CC-1 received payments through bank accounts held by an entity, Hyseven.

### CC-1 Was A BANDES Employee Involved in the Relationship with the Broker-Dealer

29. Documents demonstrating CC-1's interaction with the Broker-Dealer as a representative of BANDES, include the following:

a. An email sent on or about July 8, 2009, from Clarke to an email address that consisted of CC-1's first initial and last name, followed by "@bandes.gov.ve" and addressed to "[CC-1's first name];"

b.    An email chain in which on or about August 26, 2009, CC-1 emailed Hurtado and Gonzalez regarding BANDES bond transactions; and

c.    An email from on or about October 21, 2010, from CC-1, with a "cc" to various BANDES employees, including Gonzalez.  The email contains a signature line describing CC-1 as "Treasury Management" (translated from Spanish).

### CC-1's Involvement in the Scheme

30.    The following documents indicate that CC-1 was aware of the payments being made to Gonzalez:

a.    As referenced in the Complaint (Compl. ¶ 32(a)), on or about May 21, 2009, Hurtado sent an email to Gonzalez, with a "cc" to CC-1, attaching a document entitled "MdAG Mayo 2009.xls."  "MdAG" appear to be the initials for "Maria de los Angeles Gonzalez."  The spreadsheet contained rows of bond trades and columns reflecting, in addition to the trading prices, commissions.  Next to the commissions column was a column entitled "MdAG."  That column reflected a total of $509,250.

b.    On or about June 23, 2009, Hurtado sent an email to Gonzalez.  The subject line stated "Cuadro Junio" (translated from Spanish:  "June Graph").  The email stated (translated from Spanish):

Here I am sending you the graph for June.

Please review everything, let me know of any remarks. I reviewed everything and it is very

-15-

good.

I hope we continue this way and improve every day.

Kiss

AH

Attached to the email was a spreadsheet entitled "junio_incentivo-mary.xls." The attached spreadsheet contained rows of bond trades and columns reflecting, in addition to the trading prices, commissions. Next to the column reflecting these commissions was a column entitled "Mary." That column reflected a total of $941,366.80.

      c. On or about June 23, 2009, that same day, Maria Gonzalez forward the email referenced in the preceding paragraph to CC-1. The email stated (translated from Spanish): "For review."

      d. On or about October 15, 2009, Hurtado sent an email to Gonzalez, with a "cc" to CC-1, attaching a document entitled "Incentivo Septiembre.xls." The email stated (translated from Spanish):

Dear Gentlemen

I send the numbers of Sept[.], please review

Any questions or comments don't hesitate to let me know.

Regards

Alejandro Hurtado

The attached spreadsheet contained rows of bond trades and columns reflecting, in addition to the trading prices, commissions.  Next to the commissions column was a column entitled "Incentivo Mary."

**CC-1 Received Laundered Payments Through Hyseven**

31.  The following documents indicate that CC-1 received a portion of these kickback payments:

a.   On or about February 10, 2010, Hurtado sent an email to Gonzalez and CC-1 attaching an excel spreadsheet entitled "Incentivo Enero-Febrero 2010.xls" (translated from Spanish: "Incentives January-February 2010").  The email stated (translated from Spanish):

Dear Gentlemen

I hope you are doing well.

I invite you to [review] the attachment, in which you will find the current up to date numbers.

Please review, any questions or comments don't hesitate to let me know.

Regards

AH

The attached spreadsheet contained a total of $3,945,329.25 in a column titled "Incentivo" and the even split of that amount in columns entitled "[First Name of CC-1]" and "Mary."

-17-

b.   On or about August 11, 2010, Hurtado sent
Gonzalez an email attaching a bank transfer instruction for her
signature.   The instructions were addressed to a representative
of Bank Julius Baer and stated, in part (translated from
Spanish):

> The purpose of this memo is to request that
> you transfer from my Cartagena International
> account [the First Cartagena Account] the
> amount of USD 500,000.00 dollars, to the
> following:

The instruction then referenced an account with IBAN #
CH8008779001499990014 at Rahn & Bodmer Co. (in Switzerland), held
in the name of Hyseven S.A. (the "First Hyseven Account").   The
typed name below the signature line was: "Maria de los Angeles
Gonzalez[,] Cartagena International."

c.   On or about August 15, 2010, Gonzalez emailed
those instructions to CC-1 and stated the following in that email
(translated from Spanish):

> Hello !!
>
> I'm sending you a copy of the
> instructions sent to the bank.
>
> They will be processed during the week
> we will remain on the lookout.
>
> Kissesssss
> Mary-

d.   Bank records for the First Hyseven Account
indicate that on or about October 21, 2010, the account received
approximately $1.2 million from Cartagena.

e.   Also reflecting CC-1's involvement in the kickback scheme is the email that Hurtado sent to Clarke and another employee of the Broker-Dealer on or about April 9, 2010 that was discussed above in paragraph 24.  The subject line of the email read: "Instrucciones Cartagena + Hyseven," and the body of the email referenced the "parchita" (passion fruit) and "hormiga," (ant), which, upon information and belief, is a reference to Gonzalez and CC-1.

f.   Attached to the April 9, 2010 email was a document titled: "Transfer-EUR-USD-Hyseven.pdf."  This attached document referenced three accounts as follows:

(1)   Under the headings "Cash:" and "EUR," the attachment referenced an account with IBAN # CH5808779001499990022 at Rahn & Bodmer Co. (in Switzerland), held in the name of Hyseven S.A. (the "Second Hyseven Account").

(2)   Under the headings "Cash:" and "USD," the attachment referenced the First Hyseven Account.

(3)   Under the headings "Securities:" the attachment referenced account # 1.499.990-707 at Rahn & Bodmer Co. (in Switzerland) (the "Third Hyseven Account").

32.  Documents further indicate that an additional account held by Hyseven exists in Switzerland.  Specifically, email correspondence from on or about September 22, 2009 between Hurtado and a representative of Union Bancaire Privée, a

financial institution in Switzerland, related to the opening of a Hyseven account at that bank (the "Fourth Hyseven Account"). In addition, CC-1 sent Hurtado an email dated on or about October 16, 2009, attaching executed Union Bancaire Privée account opening documents. On a form within those documents that calls for the identification of the beneficial owner of the account, two individuals with the same last name of CC-1 are listed.

### HURTADO PURCHASES REAL ESTATE WITH PROCEEDS OF THE SCHEME

33. According to the records referenced below, Hurtado and Hurtado's Spouse utilized proceeds they obtained by virtue of the scheme set forth in the Complaint to purchase real property in the Miami, Florida area.

### The Blatt Boulevard Property

34. Public records for Broward County, Florida indicate that Hurtado purchased a condominium apartment located at 16171 Blatt Boulevard, Apartment Number 404, Weston, Florida 33326 (the "Blatt Boulevard Property") on or about April 24, 2006. Upon information and belief, Bank United FSB held a mortgage on this property for approximately $227,700.

35. According to bank records from Washington Mutual, Inc. ("WAMU"), Hurtado and/or Hurtado's Spouse have several bank accounts at WAMU, including bank accounts ending in 5841 (the "5841 WAMU Account"), 1743 (the "1743 WAMU Account"), and 0468 (the "0468 WAMU Account") (collectively, the "Hurtado WAMU

Accounts").

36.   A review of the records for the Hurtado WAMU
Accounts reveals the use of the proceeds of the scheme set forth
herein to pay off the Blatt Boulevard Property mortgage, as
follows:

a.   On or about July 31, 2009, approximately
$4,157,118.73 was deposited into the 5841 WAMU Account from the
Broker-Dealer.

b.   On or about July 31, 2009, approximately
$4,115,200 of this amount was transferred from the 5841 WAMU
Account to the 0468 WAMU Account.

c.   On or about August 10, 2009, approximately
$250,000 was transferred from the 0468 WAMU Account to the 1743
WAMU Account.

d.   On or about August 10, 2009, the same day,
approximately $242,737 was wired from the 1743 WAMU Account to
Bank United in order to, upon information and belief, pay off the
mortgage loan on the Blatt Boulevard Property.

### The Brickell Key Drive Property

37.   Public records for Miami-Dade County, Florida,
indicate that Hurtado's Spouse purchased a condominium apartment
located at 848 Brickell Key Drive, Apartment Number 4405, Miami,
Florida 33131 (the "Brickell Key Drive Property") on or about
September 29, 2009.

-21-

38.   A review of the following records for the Hurtado WAMU Accounts reveals the use of the proceeds of the scheme set forth herein to purchase the Brickell Key Drive Property:

a.   On or about August 27, 2009, approximately $2,782,947 was deposited into the 5841 WAMU Account from the Broker-Dealer.

b.   On or about August 28, 2009, the next day, approximately $2,700,000 of this amount was transferred from the 5841 WAMU Account to the 0468 WAMU Account.

c.   On or about September 29, 2009, approximately $1,200,000 was transferred from the 0468 WAMU Account to the 5841 WAMU Account.

d.   Also on or about September 29, 2009, the same day, a bank check was issued to Colossus Title drawn on the 5841 WAMU Account in the amount of approximately $1,197,241 in connection with the purchase of the Brickell Key Drive Property.

### The Brickell Avenue Property

39.   Public records for Miami-Dade County, Florida, indicate that Hurtado purchased a condominium apartment located at 495 Brickell Avenue, Unit Number 1706, Miami, Florida 33131 (the "Brickell Avenue Property") in or about April 2010.

40.   Public records for Miami-Dade County, Florida, also indicate that Hurtado, in that same month, transferred the

Brickell Avenue Property to an entity known as HAS Icon Realty, LLC, through the use of a Quit Claim Deed.

41. Bank Account records held at Bank of America for the business entity known as HAS Icon Realty, LLC, indicate that the signatory on this HAS Icon Realty account is Hurtado, who is also listed as the Manager of HAS Icon Realty, LLC, on bank opening documents dated April 14, 2010.

42. A review of bank records reveals the use of the proceeds of the scheme set forth herein to purchase the Brickell Avenue Property.

43. According to bank records from HSBC Bank ("HSBC") and Bank of America ("BOA"), Hurtado has multiple bank accounts at HSBC, including accounts ending in 2907 (the "2907 HSBC Account"), and 9850 (the "9850 HSBC Account") and at least one bank account at BOA (the "Hurtado BOA Account").

44. Bank records for the Hurtado BOA Account indicate numerous payments from the Broker-Dealer in the months preceding the purchase of the Brickell Avenue Property by Hurtado on April 2, 2010. Specifically:

a. On or about February 16, 2010, $2,139,563.62 was deposited into the Hurtado BOA Account from the Broker-Dealer.

b.   On or about that same date, an additional $32,519.40 was deposited into the Hurtado BOA Account from the Broker-Dealer.

c.   On or about February 26, 2010, $32,969.64 was deposited into the Hurtado BOA Account from the Broker-Dealer.

45.   On or about March 1, 2010, $2,000,000 was transferred from the Hurtado BOA Account to Hurtado's 2907 HSBC Account.

46.  A review of HSBC Bank statements for Hurtado's accounts reveal the following:

a.   On March 1, 2010, $2,000,000 was deposited into the 2907 HSBC Account, as set forth above.

b.   On March 4, 2010, $2,000,000 was transferred from the 2907 HSBC Account into the 9850 HSBC Account.

c.   On March 25, 2010, $50,000 was transferred from the 9850 HSBC Account to the 2907 HSBC Account, and that same day, a payment of $48,000 was made from the 2907 HSBC Account to an escrow account held in the name of "BNF: Chicago Title Insurance Company," with a reference of "Unit 1706" in the description of transactions.

d.   On April 8, 2010, $250,000 was transferred from the 9850 HSBC Account into the 2907 HSBC Account.

e.   On or about that same date, a U..S. dollar draft in the amount of approximately $244,297 was made from the

-24-

2907 HSBC Account in order, upon information and belief, to complete the purchase of Brickell Avenue Property.

### The 37th Avenue Property

47.    Public records for Miami-Dade County, Florida, indicate that an entity called SHA The Point LLC, purchased a condominium apartment located at 21205 NE 37th Avenue, Unit 1601, Aventura, Florida 33180 (the "37th Avenue Property")[7] on or about June 13, 2011.

48.    A review of condominium association records related to the 37th Avenue Property indicates that the relevant condominium association approved the sale of Unit 1601 to "SHA The Point LLC/Jose Hurtado" on or about June 8, 2011.

49.    Bank Account records held at Bank of America for the business entity known as SHA The Point LLC, reveal that the signatory on that account is Hurtado, who is listed as the Manager of SHA The Point LLC, on bank opening documents dated July 6, 2011.

50.    A review of the records for the Hurtado BOA Account reveals the use of the proceeds of the scheme set forth herein for the purchase of the 37th Avenue Property, as follows:

---

[7] The Blatt Boulevard Property, the Brickell Key Drive Property, the Brickell Avenue Property, and the 37th Avenue Property are referred to herein, collectively, as the "Target Properties."

a.   Between approximately March 2010 and June 13, 2011, at least $578,000 in total from the Broker-Dealer was deposited, in regular intervals, into the Hutado BOA Account.

b.   On or about April 13, 2011, a counter debit was made from that account in the amount of approximately $406,524 on June 13, 2011 - the same date that SHA The Point LLC - of which Hurtado is an officer - purchased the 37th Avenue Property.

### IV. CLAIMS FOR FORFEITURE

#### FIRST CLAIM FOR RELIEF
#### Forfeiture Under 15 U.S.C. §§ 78dd-2 and 981(a)(1)(C) – FCPA Violations and Conspiracy

51.   Paragraphs 1 through 50 of this Complaint are repeated and realleged as if fully set forth herein.

52.   Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture:

> Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section . . . 1344 of this title or any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

53.   Title 18, United States Code, Section 1956(c)(7)(D) defines the term "specified unlawful activity" to include "any felony violation of the Foreign Corrupt Practices Act."

-26-

54.   The Foreign Corrupt Practices Act, codified, in part, in Title 15, United States Code, Section 78dd-2, prohibits, inter alia:

> [A]ny domestic concern . . . or [] any officer, director, employee, or agent of such domestic concern . . . to make use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to . . . any foreign official for purposes of--
>
> > (A)(i)   influencing any act or decision of such foreign official in his official capacity, (ii) inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official, or (iii) securing any improper advantage; or
> >
> > (B)   inducing such foreign official to use his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality,
>
> in order to assist such domestic concern in obtaining or retaining business for or with, or directing business to, any person[.]

55.   As set forth herein and in the attached Complaint, Clarke, Hurtado, and others known and unknown, conspired to, and, in fact, did make payments to, among others, Gonzalez, for the purposes of obtaining and retaining BANDES' business for the Broker-Dealer, a domestic concern as defined in the FCPA.  As part of this scheme, millions of dollars originating from the Broker-Dealer in New York, New York were transferred to the Money

-27-

Laundering Entities and received into accounts held by these Entities. Also as part of this scheme, Hurtado, among others, received millions of dollars in the form of salary and bonuses, both personally and through payments made to Hurtado's Spouse.

56. The Defendant Property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) as property constituting, or derived from, proceeds of felony violations of the FCPA.

**SECOND CLAIM FOR RELIEF**
**Forfeiture Under 18 U.S.C. §§ 1952 and 981(a)(1)(C) –**
**Travel Act Violations and Conspiracy**

57. Paragraphs 1 through 50 of this Complaint are repeated and realleged as if fully set forth herein.

58. Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture:

> Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section . . . 1344 of this title or any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

59. Title 18, United States Code, Section 1956(c)(7) defines the term "specified unlawful activity" to mean, in relevant part, "any act or activity constituting an offense listed in section 1961(1) of this title. . . ." Among the offenses set forth in 18 U.S.C. § 1961(1) is 18 U.S.C. § 1952.

60.  Title 18, United States Code, Section 1952(a) prohibits, inter alia, any person or entity who uses "any facility in interstate or foreign commerce," who:

with the intent to  –

(1)  distribute the proceeds of any unlawful activity; or []

(3)  otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity

from thereafter performing or attempting to perform the conduct set forth in subparagraphs (1) and (3) above.

61.  Section 1952(b) specifically includes within the definition of "unlawful activity:" "bribery . . . in violation of the laws of the State in which committed or of the United States."

62.  As set forth herein and in the attached Complaint, Clarke, Hurtado, Gonzalez, CC-1, and others known and unknown, used facilities in interstate and foreign commerce, with the intent to both (1) distribute the proceeds of an unlawful activity, and (2) promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity; specifically, (a) violations of the anti-bribery provisions of the FCPA, Title 15, United States Code, Section 78dd-2, (b) commercial bribery, in violation of New York State Penal Law Section 180.00, and (c) commercial bribe receiving, in violation of New York State Penal Law Section

180.05.  As part of this scheme, millions of dollars originating from the Broker-Dealer in New York, New York were transferred to the Money Laundering Entities and received into accounts held by these Entities.  Also as part of this scheme, Hurtado, among others, received millions of dollars in the form of salary and bonuses, both personally and through payments made to Hurtado's Spouse.

63.  The Defendant Property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) as property constituting, or derived from, proceeds of violations of Section 1952.

### THIRD CLAIM FOR RELIEF
### Forfeiture Under 18 U.S.C. § 981(a)(1)(A) - International Money Laundering and Conspiracy

64.  Paragraphs 1 through 50 of this Complaint are repeated and realleged as if fully set forth herein.

65.  Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of section 1956 [or] 1957 . . . of [Title 18, relating to money laundering offenses], or any property traceable to such property," is subject to forfeiture.

66.  Pursuant to Title 18, United States Code, Section 1956, a crime is committed by a person who:

> (a)(2) . . . transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to

or through a place outside the United States
or to a place in the United States from or
through a place outside the United States –

> (A) with the intent to promote the
> carrying on of specified unlawful
> activity . . . .

67.   Title 18, United States Code, Section 1956(h)
further provides that "[a]ny person who conspires to commit any
offense defined in this section or section 1957 shall be subject
to the same penalties as those prescribed for the offense the
commission of which was the object of the conspiracy."

68.   "Specified unlawful activity" is defined in 18
U.S.C. § 1956(c)(7).  Section 1956(c)(7)(D) includes in its
definition of "specified unlawful activity," "any felony
violation of the Foreign Corrupt Practices Act."  Section
1956(c)(7)A) also includes in its definition of "specified
unlawful activity," any offense listed under 18 U.S.C. § 1961(1).
Section 1961(1) lists, among other offenses, violations of 18
U.S.C. § 1952 (the Travel Act).

69.   As set forth herein, the Money Laundering
Entities, as entities, were property involved in money laundering
and facilitated these transactions.  All assets of the Money
Laundering Entities, including all assets in the Target Accounts,
and the Additional Target Funds are subject to forfeiture
pursuant to Title 18, United States Code, Section 981(a)(1)(A) as
they constitute property involved in, or property traceable to

-31-

such property, transfers and the transmission of monetary instruments and funds from inside the United States to outside the United States, with these transfers and transmission having been intended to promote specified unlawful activity, namely violations of the FCPA and the Travel Act.

## FOURTH CLAIM FOR RELIEF
### Forfeiture Under 18 U.S.C. § 981(a)(1)(A) - Engaging in Monetary Transactions In Property Derived from Specified Unlawful Activity

70.   Paragraphs 1 through 50 of this Complaint are repeated and realleged as if fully set forth herein.

71.   Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of section 1956 [or] 1957 . . . of [Title 18, relating to money laundering offenses], or any property traceable to such property," is subject to forfeiture.

72.   Title 18, United States Code, Section 1957 provides that: "Whoever, [with such offense under this section taking place in the United States] knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity," shall be guilty of a crime.

73.   Title 18, United States Code, Section 1956(h) further provides that "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject

-32-

to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

74.   The Target Properties are subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A) as property involved in, or property traceable to such property, monetary transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, namely violations of the Foreign Corrupt Practices Act and the Travel Act, and a conspiracy to engage in such transactions.

WHEREFORE, Plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant Property and that all persons having an interest in the Defendant Property be required to appear and show cause why the forfeiture of the Defendant Property should not be decreed, that this Court decree forfeiture of the Defendant Property to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as it may deem just and proper, together with the costs and disbursements of this action.

Dated:   New York, New York
         May 6, 2013

> PREET BHARARA
> United States Attorney for
> the Southern District of New York
> Attorney for the Plaintiff
> United States of America
>
> By:  _____ (For)
>      Carolina A. Fornos
>      Harry A. Chernoff
>      Jason H. Cowley
>      Assistant United States Attorney
>      One St. Andrew's Plaza
>      New York, New York 10007
>      (212) 637-2479/2740
>
>
> _____ (For)
> JAMES M. KOUKIOS
> MARIA GONZALEZ CALVET
> United States Department of Justice
> Criminal Division, Fraud Section

-34-

VERIFICATION

STATE OF NEW YORK            )
COUNTY OF NEW YORK           )
SOUTHERN DISTRICT OF NEW YORK )

THOMAS E. PETROUSKIE, being duly sworn, deposes and says that he is a Special Agent of the Federal Bureau of Investigation and as such has responsibility for the within action; that he has read the foregoing Verified Complaint and knows the contents thereof; and that the same is true to the best of his own knowledge, information and belief.

The sources of deponent's information and the ground of his belief are official records and files of the United States and information obtained directly and indirectly by deponent during an investigation of alleged violations of federal criminal laws.


_____
THOMAS E. PETROUSKIE
Special Agent
Federal Bureau of Investigation


Sworn to before me this
_6_ day of May, 2013:

_____
NOTARY PUBLIC

MARCO DASILVA
Notary Public, State of New York
No. 01DA6145603
Qualified in Nassau County
My Commission Expires _May 8, 2014_

### SCHEDULE A

### All Assets of the Following Money Laundering Entities

1.   Cartagena International, Inc. ("Cartagena")

2.   ETC Investment(s) SA ("ETC Investments")

3.   Castilla Holdings SA ("Castilla")

4.   H.A.S. Investment Group SA ("H.A.S. Investment Group")

5.   Hyseven SA ("Hyseven")

### Including But Not Limited To All Assets in the Following Target Accounts

#### The Cartagena Accounts

1.   Account # 0305.2492 at Bank Julius Baer & Co. Ltd. In Switzerland, held in the name of Cartagena International, Inc. (the "First Cartagena Account")

2.   Account # 1.254.710-027 at Rahn & Bodmer in Switzerland, held in the name of Cartagena International, Inc. (the "Second Cartagena Account")

3.   Account # 1.254.710-019 at Rahn & Bodmer in Switzerland, held in the name of Cartagena International, Inc. (the "Third Cartagena Account")

4.   Account # 1.254.710-701 at Rahn & Bodmer Co. in Switzerland (the "Fourth Cartagena Account")

5.   Account/IBAN # CH9208762000810500001 at CBH Compagnie Bancaire Helvétique SA in Switzerland, held in the name of Cartagena International, Inc. (the "Fifth Cartagena Account")

#### The ETC Investment(s) Accounts

6.   Account # 506712 at Mirabaud & Cie in Switzerland, held in the name of ETC Investment(s) S.A. (the "First ETC Investments Account")

7.   Account # 03-24-01-051488-1 at Banco General S.A. in Panama, held in the name of ETC Investment(s) S.A. (the "Second ETC Investments Account")

8.   Account # 7993-4 at CBH Compagnie Bancaire Helvétique S.A. in Switzerland, held in the name of ETC Investment(s) S.A. (the "Third ETC Investments Account")

<u>The Castilla Account</u>

9.   Account # 504919 Mirabaud & Cie in Switzerland, held in the name of Castilla Holdings S.A. (the "Castilla Account")

<u>The H.A.S. Investment Accounts</u>

10.   Account # 506761 at Mirabaud & Cie in Switzerland, held in the name of H.A.S. Investment Group S.A. (the "First H.A.S. Investment Account")

11.   Account # 506877 at Mirabaud & Cie in Switzerland, held in the name of H.A.S. Investment Group S.A. (the "Second H.A.S. Investment Account")

<u>The Hyseven Accounts</u>

12.   Account/IBAN # CH8008779001499990014 at Rahn & Bodmer in Switzerland, held in the name of Hyseven S.A. (the "First Hyseven Account")

13.   Account/IBAN # CH5808779001499990022 at Rahn & Bodmer in Switzerland, held in the name of Hyseven S.A. (the "Second Hyseven Account")

14.   Account # 1.499.990-707 at Rahn & Bodmer Co. in Switzerland (the "Third Hyseven Account")

15.   The Account at Union Bancaire Privee in Switzerland held in the name of Hyseven S.A (the "Fourth Hyseven Account")

## SCHEDULE B

### The Following Additional Target Funds

1. $509,250 in assets held in account # 707-3860 at Bank Hapoalim (Switzerland), held in the name of Jorge Hernandez Gonzalez (the "Jorge Gonzalez Account")

## SCHEDULE C

### All Right, Title, and Interest
### in the Following Target Properties

1. The condominium apartment located at 16171 Blatt Boulevard, Apartment Number 404, Weston, Florida 33326, and all appurtenances thereto (the "Blatt Boulevard Property")

2. The condominium apartment located at 848 Brickell Key Drive, Apartment Number 4405, Miami, Florida 33131, and all appurtenances thereto (the "Brickell Key Drive Property")

3. The condominium apartment located at 495 Brickell Avenue, Unit Number 1706, Miami, Florida 33131, and all appurtenances thereto (the "Brickell Avenue Property")

4. The condominium apartment located at 21205 NE 37th Avenue, Unit 1601, Aventura, Florida 33180, and all appurtenances thereto (the "37th Avenue Property")

# Exhibit A

Approved: _____ **13 MAG 0683**
         HARRY A. CHERNOFF
         JASON H. COWLEY
         Assistant United States Attorneys

Before:  THE HONORABLE RONALD L. ELLIS
         United States Magistrate Judge
         Southern District of New York

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :      SEALED
                                         COMPLAINT
              -v-                 :
                                         Violations of
TOMAS ALBERTO CLARKE              :      18 U.S.C. § 371
BETHANCOURT,                             15 U.S.C. § 78dd-2
JOSE ALEJANDRO HURTADO, and      :      18 U.S.C. § 1952(a)(3)(A)
MARIA DE LOS ANGELES GONZALEZ            18 U.S.C. § 1956(a)(2)(A)
DE HERNANDEZ, a/k/a "Maria De    :      18 U.S.C. § 1956(h)
Los Angeles Gonzalez,"                   18 U.S.C. § 2
a/k/a "Mary,"                    :

              Defendants.         :

- - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        LILIAN PEREZ, being duly sworn, deposes and says that
she is a Special Agent with the Federal Bureau of Investigation
and charges as follows:

## COUNT ONE
(Conspiracy To Violate the Foreign Corrupt Practices Act)

        1.    From at least in or around December 2008 through
in or around October 2010, in the Southern District of New York
and elsewhere, TOMAS ALBERTO CLARKE BETHANCOURT (hereinafter
"TOMAS CLARKE"), and JOSE ALEJANDRO HURTADO (hereinafter
"ALEJANDRO HURTADO"), the defendants, and others known and
unknown, willfully and knowingly did combine, conspire,
confederate and agree together and with each other to commit an
offense against the United States, to wit, violations of the
Foreign Corrupt Practices Act (the "FCPA"), Title 15, United
States Code, Section 78dd-2.

        2.    It was a part and object of the conspiracy that
TOMAS CLARKE and ALEJANDRO HURTADO, the defendants, and others
known and unknown, being citizens, nationals, and residents of

the United States and officers, directors, employees, and agents of "domestic concerns," as that term is defined in the FCPA, and stockholders thereof acting on behalf of such "domestic concerns," would and did make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of moneys, offers, gifts, promises to give, and authorizations of the giving of things of value to foreign officials, and to any person, while knowing that the money or thing of value will be offered, given, or promised to a foreign official, for purposes of (a) influencing acts and decisions of such foreign officials in their official capacity, (b) inducing such foreign officials to do and omit to do acts in violation of the lawful duty of such officials, (c) securing an improper advantage, and (d) inducing such foreign officials to use their influence with a foreign government, and agencies and instrumentalities thereof, to affect and influence acts and decisions of such foreign government, and agencies and instrumentalities thereof, in order to assist TOMAS CLARKE and ALEJANDRO HURTADO and others known and unknown in obtaining and retaining business for and with, and directing business to, any person, in violation of Title 15, United States Code, Section 78dd-2.

## Overt Acts

3.    In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    On or about May 21, 2009, ALEJANDRO HURTADO, the defendant, emailed MARIA DE LOS ANGELES GONZALEZ DE HERNANDEZ, a/k/a "Maria De Los Angeles Gonzalez" a/k/a "Mary" (hereinafter, "MARIA GONZALEZ"), a foreign official in Venezuela, a spreadsheet of bond transactions and associated commissions. This spreadsheet, which related to transactions occurring in May 2009, reflected that 50% of the commissions were for "MdAG," which are GONZALEZ's initials, for a total amount of $509,250.

b.    On or about July 13, 2009, HURTADO received instructions in an email from GONZALEZ directing him to wire certain funds to an account in Switzerland held in the name of an associate of GONZALEZ ("Associate 1").

c.    On or about July 21, 2009, acting upon the instructions described above, HURTADO caused to be wired approximately $509,250 from an account in the United States that

had received funds from a particular broker-dealer (the "Broker-Dealer") in New York, New York, to a correspondent account maintained in New York, New York, for further transfer to an account in Switzerland held in the name of Associate 1.

      d.    On or about September 29, 2009, the Broker-Dealer in New York sent a wire transfer of approximately $2,002,983 to an account held by a Panamanian company, ETC Investments SA,[1] in Switzerland and controlled by TOMAS CLARKE, the defendant.

      e.    On or about January 28, 2010, CLARKE caused his employer, the Broker-Dealer, to purchase and sell certain bonds.

      f.    On or about April 19, 2010, CLARKE caused to be wired approximately $883,488 from an ETC Investments account in Switzerland holding funds that had been received from the Broker-Dealer in New York, New York, to an account in Switzerland held by a company owned jointly by GONZALEZ and Associate 1.

      g.    On or about May 6, 2010, CLARKE caused to be wired approximately $700,000 from an ETC Investments account in Switzerland that had received funds from the Broker-Dealer in New York, New York, to an account in Switzerland held by a company owned jointly by GONZALEZ and Associate 1.

      (Title 18, United States Code, Section 371.)

<u>COUNT TWO</u>
(Violation of the Foreign Corrupt Practices Act)

      4.    On or about July 21, 2009, in the Southern District of New York and elsewhere, ALEJANDRO HURTADO, the defendant, being a citizen, national, and resident of the United States and therefore a "domestic concern," as that term is defined in the FCPA, and an officer, director, employee, and agent of a "domestic concern," and a stockholder thereof acting on behalf of such "domestic concern," made use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of offers, payments, promises to pay, and authorizations of the payment of any money, and offers, gifts, promises to give, and authorizations of the giving of things of

---

    [1] This entity was also referred to as "ETC Investment, Inc." and "ETC Investment SA." For purposes of this Complaint, this entity is referred to as "ETC Investments."

value to foreign officials, and to any person, while knowing that the money or thing of value will be offered, given, or promised to a foreign official, for purposes of (a) influencing acts and decisions of such foreign officials in their official capacities, (b) inducing such foreign officials to do and omit to do acts in violation of the lawful duty of such officials, (c) securing an improper advantage, and (d) inducing such foreign officials to use their influence with a foreign government, and agencies and instrumentalities thereof, to affect and influence acts and decisions of such foreign government, and agencies and instrumentalities thereof, in order to assist HURTADO in obtaining and retaining business for and with, and directing business to, any person, to wit, HURTADO used the means and instrumentalities of interstate commerce to wire a payment at the direction of MARIA GONZALEZ, a foreign official in Venezuela, of approximately $509,250 to an account held in the name of Associate 1, in order to obtain and retain trading business directed by GONZALEZ on behalf of a Venezuelan state-owned and state-controlled economic development bank to the Broker-Dealer, with which HURTADO was affiliated.

(Title 15, United States Code, Section 78dd-2, and
Title 18, United States Code, Section 2.)

**COUNT THREE**
(Violation of the Foreign Corrupt Practices Act)

5.     Between on or about May 18 and on or about June 4, 2010, in the Southern District of New York and elsewhere, TOMAS CLARKE, the defendant, being a citizen, resident, and national of the United States and therefore a "domestic concern," as that term is defined in the FCPA, and an officer, director, employee, and agent of a "domestic concern," and a stockholder thereof acting on behalf of such "domestic concern," made use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of offers, payments, promises to pay, and authorizations of the payment of any money, and offers, gifts, promises to give, and authorizations of the giving of things of value to foreign officials, and to any person, while knowing that the money or thing of value will be offered, given, or promised to a foreign official, for purposes of (a) influencing acts and decisions of such foreign officials in their official capacities, (b) inducing such foreign officials to do and omit to do acts in violation of the lawful duty of such officials, (c) securing an improper advantage, and (d) inducing such foreign officials to use their influence with a foreign government, and agencies and instrumentalities thereof, to affect and influence acts and decisions of such foreign government, and

-4-

agencies and instrumentalities thereof, in order to assist CLARKE in obtaining and retaining business for and with, and directing business to, any person, to wit, CLARKE, acting as an intermediary, caused certain funds to be sent from the Broker-Dealer in New York, New York to MARIA GONZALEZ, a foreign official in Venezuela, in order to obtain and retain trading business directed by GONZALEZ on behalf of a Venezuelan state-owned and state-controlled economic development bank to the Broker-Dealer.

(Title 15, United States Code, Section 78dd-2, and Title 18, United States Code, Section 2.)

<u>COUNT FOUR</u>
(Conspiracy To Violate the Travel Act)

6.     From at least in or around December 2008 through in or around October 2010, in the Southern District of New York and elsewhere, TOMAS CLARKE, ALEJANDRO HURTADO, and MARIA GONZALEZ, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit an offense against the United States, to wit, violation of the Travel Act, Title 18, United States Code, Section 1952(a)(3)(A).

7.     It was a further part and object of the conspiracy that TOMAS CLARKE, ALEJANDRO HURTADO, and MARIA GONZALEZ, the defendants, and others known and unknown, unlawfully, willfully, and knowingly, would and did travel in interstate and foreign commerce and use the mail and facilities in interstate and foreign commerce, with intent to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activities, namely, (a) violations of the anti-bribery provisions of the FCPA, Title 15, United States Code, Section 78dd-2, (b) commercial bribery, in violation of New York State Penal Law Section 180.00 and (c) commercial bribe receiving, in violation of New York State Penal Law Section 180.05; and thereafter would and did perform and attempt to perform acts to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on, of such unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3)(A).

<u>Overt Acts</u>

8.     In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others,

-5-

were committed in the Southern District of New York and elsewhere:

a.    On or about May 21, 2009, ALEJANDRO HURTADO, the defendant, emailed MARIA GONZALEZ, the defendant, a spreadsheet of bond transactions and associated commissions. This spreadsheet, which related to transactions occurring in May 2009, reflected that 50% of the commissions were for "MdAG," which are GONZALEZ's initials, for a total amount of $509,250.

b.    On or about July 13, 2009, HURTADO received instructions in an email from GONZALEZ directing him to wire funds to an account in Switzerland held in the name of Associate 1.

c.    On or about July 21, 2009, acting upon the instructions described above, HURTADO caused to be wired approximately $509,250 from an account in the United States that had received funds from the Broker-Dealer to a correspondent account maintained in New York, New York, for further transfer to an account in Switzerland held in the name of Associate 1.

d.    On or about September 29, 2009, the Broker-Dealer in New York sent a wire transfer of approximately $2,002,983 to an account held by ETC Investments in Switzerland and controlled by TOMAS CLARKE, the defendant.

e.    On or about January 28, 2010, CLARKE caused his employer, the Broker-Dealer, to purchase and sell certain bonds.

f.    On or about April 19, 2010, CLARKE caused to be wired approximately $883,488 from an ETC Investments account in Switzerland that had received funds from the Broker-Dealer in New York, New York, to an account in Switzerland held by a company owned jointly by GONZALEZ and Associate 1.

g.    On or about May 6, 2010, CLARKE caused to be wired approximately $700,000 from an ETC Investments account in Switzerland that had received funds from the Broker-Dealer in New York, New York, to an account in Switzerland held by a company owned jointly by GONZALEZ and Associate 1.

(Title 18, United States Code, Section 371.)

-6-

## COUNT FIVE
(Violation of the Travel Act)

9.   On or about July 21, 2009, in the Southern District of New York and elsewhere, ALEJANDRO HURTADO and MARIA GONZALEZ, the defendants, unlawfully, willfully, and knowingly, would and did travel in interstate and foreign commerce and use the mails and facilities in interstate commerce, with intent to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity, namely, (a) violations of the anti-bribery provisions of the FCPA, Title 15, United States Code, Section 78dd-2, (b) commercial bribery, in violation of New York State Penal Law Section 180.00, and (c) commercial bribe receiving, in violation of New York State Penal Law Section 180.05; and thereafter would and did perform and attempt to perform acts to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on, of such unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3)(A), to wit, HURTADO used facilities in interstate commerce to wire a payment at the direction of GONZALEZ, a foreign official in Venezuela, of approximately $509,250 to an account held in the name of an associate of GONZALEZ, in order to obtain and retain trading business directed by GONZALEZ on behalf of a Venezuelan state-owned and state-controlled economic development bank to the Broker-Dealer, with which HURTADO was affiliated.

(Title 18, United States Code, Sections 1952 and 2.)

## COUNT SIX
(Violation of the Travel Act)

10.   Between on or about May 18 and June 4, 2010, in the Southern District of New York and elsewhere, TOMAS CLARKE, the defendant, unlawfully, willfully, and knowingly, would and did travel in interstate and foreign commerce and use the mails and facilities in interstate commerce, with intent to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity, namely, (a) violations of the anti-bribery provisions of the FCPA, Title 15, United States Code, Section 78dd-2, (b) commercial bribery, in violation of New York State Penal Law Section 180.00, and (c) commercial bribe receiving, in violation of New York State Penal Law Section 180.05; and thereafter would and did perform and attempt to perform acts to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on, of such unlawful

-7-

activity, in violation of Title 18, United States Code, Section 1952(a)(3)(A), to wit, CLARKE, acting as an intermediary, caused certain funds to be sent from the Broker-Dealer in New York, New York to MARIA GONZALEZ, a foreign official in Venezuela, in order to obtain and retain trading business directed by GONZALEZ on behalf of a Venezuelan state-owned and state-controlled economic development bank to the Broker-Dealer.

(Title 18, United States Code, Sections 1952 and 2.)

### COUNT SEVEN
(Conspiracy To Commit Money Laundering)

11.   From at least in or around December 2008 through in or around October 2010, in the Southern District of New York and elsewhere, TOMAS CLARKE, ALEJANDRO HURTADO, and MARIA GONZALEZ, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Section 1956.

12.   It was a part and an object of said conspiracy that ALEJANDRO HURTADO, TOMAS CLARKE, and MARIA GONZALEZ, the defendants, and others known and unknown, would and did transport, transmit and transfer funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is, (1) violations of the FCPA, Title 15, United States Code, Section 78dd-2, and (2) violations of the Travel Act, Title 18, United States Code, Section 1952(a)(3)(A).

(Title 18, United States Code, Sections 1956(h))

### COUNT EIGHT
(Money Laundering)

13.   On or about July 21, 2009, in the Southern District of New York and elsewhere, ALEJANDRO HURTADO and MARIA GONZALEZ, the defendants, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully, and knowingly would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful

-8-

activity, that is, (1) violations of the FCPA, Title 15, United States Code, Section 78dd-2, and (2) violations of the Travel Act, Title 18, United States Code, Section 1952(a)(3)(A); to wit, HURTADO and GONZALEZ caused approximately $509,250 to be wire transferred from the United States to Switzerland, to carry on the bribery scheme described more fully below.

(Title 18, United States Code, Sections 1956(a)(2)(A) and 2.)

<u>COUNT NINE</u>
(Money Laundering)

14.    Between in or about May 18 and June 4, 2010, in the Southern District of New York and elsewhere, TOMAS CLARKE, the defendant, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully, and knowingly would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds from a place inside the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is, (1) violations of the FCPA, Title 15, United States Code, Section 78dd-2, and (2) violations of the Travel Act, Title 18, United States Code, Section 1952(a)(3)(A); to wit, CLARKE, acting as an intermediary, caused certain funds to be sent from the Broker-Dealer in New York, New York to an account in Switzerland controlled by MARIA GONZALEZ, to carry on the bribery scheme described more fully below.

(Title 18, United States Code, Sections 1956(a)(2)(A) and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

15.    I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been an FBI Special Agent for approximately 7 years, and I have personally participated in the investigation described herein. This affidavit is based upon my conversations with others, including other law enforcement agents, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

-9-

## RELEVANT ENTITIES AND THE DEFENDANTS

16.   At all times relevant to this Complaint, Banco de Desarrollo Económico y Social de Venezuela ("BANDES"), the state-owned and state-controlled economic development bank of the Bolivarian Republic of Venezuela, operated under the direction of the Venezuelan People's Ministry of Planning and Finance.   BANDES acted as the financial agent of the Venezuelan government in order to promote economic and social development, serve as the trustee for agencies of the public sector, and support the expansion and diversification of Venezuela's infrastructure.

17.   At all times relevant to this Complaint, the "Broker-Dealer" was a brokerage firm registered with the U.S. Securities and Exchange Commission (the "SEC") and with its principal place of business in New York, New York.   The Broker-Dealer maintained desks at the New York and American Stock Exchanges and had offices in New York, New York, as well as Miami, Florida.

18.   Since approximately June 2008, and at all times relevant to this Complaint, MARIA GONZALEZ, the defendant, served as either the Vice President of Finance or Executive Manager of Finance and Funds Administration of BANDES.   As such, GONZALEZ was a "foreign official" as that term is defined by the FCPA.   In these capacities, GONZALEZ oversaw BANDES's trading abroad, including trading by the Broker-Dealer on behalf of BANDES. GONZALEZ was listed by the Broker-Dealer as the authorized trading contact for BANDES.

19.   Beginning in or around late 2008, TOMAS CLARKE, the defendant, was an employee of the Broker-Dealer based in Miami, Florida.   CLARKE served as a Senior Vice President in the Global Markets Group of the Broker-Dealer.   CLARKE was listed as the Broker-Dealer's account opening salesman for the BANDES account.

20.   Beginning in or about July 2009, ALEJANDRO HURTADO, the defendant, was an employee of the Broker-Dealer based in Miami, Florida.   Prior to that, beginning in or around January 2009, HURTADO's spouse ("Hurtado's Spouse") was affiliated with the Broker-Dealer as a foreign finder.[2]

---

[2] The Financial Industry Regulatory Authority ("FINRA") has promulgated rules permitting compensation to be paid to non-registered "foreign finders" based on the business they direct to a registered broker-dealer if certain conditions are met.

-10-

According to payroll records, in 2010, HURTADO's first full year
of employment at the Broker-Dealer, HURTADO was one of the
highest compensated employees at the Broker-Dealer, receiving
approximately $4,384,616 in salary and bonus.

## OVERVIEW OF THE BRIBERY SCHEME

21.   Based on the information set forth herein, there
is probable cause to believe that TOMAS CLARKE and ALEJANDRO
HURTADO, the defendants, and others known and unknown, directed
kickback payments to MARIA GONZALEZ, the defendant, in exchange
for GONZALEZ steering BANDES business to the Broker-Dealer and
authorizing BANDES to execute bond trades with the Broker-Dealer.
As set forth below, between at least in or around December 2008
and October 2010, GONZALEZ received at least $3.6 million in
payments through insiders and affiliates of the Broker-Dealer.
The payments to GONZALEZ represented a portion of the monies
generated by the Broker-Dealer's bond trading activity in
connection with BANDES.   During this time period, with GONZALEZ
both acting as the authorized trading contact in regard to the
Broker-Dealer and managing the relationship between BANDES and
the Broker-Dealer, BANDES directed substantial business to the
Broker-Dealer and carried out bond transactions that resulted in
the Broker-Dealer generating tens of millions of dollars in
revenue.

22.   As part of the scheme, ALEJANDRO HURTADO, the
defendant, and Hurtado's Spouse received millions of dollars from
the Broker-Dealer in the form of salary, bonus payments, and
finders fees, that were generated from the Broker-Dealer's mark-
ups and mark-downs in connection with the securities it bought
from and sold to BANDES.   HURTADO, in turn, conveyed a portion of
these funds back to MARIA GONZALEZ, the defendant.   Also as part
of this scheme, millions of dollars generated from BANDES-related
mark-ups and mark-downs were sent from the Broker-Dealer to a
foreign entity controlled by CLARKE, with a portion of these
funds being further transferred to an entity owned jointly by
GONZALEZ and Associate 1 (the "Gonzalez Company").

23.   In order to promote this bribery scheme, TOMAS
CLARKE and ALEJANDRO HURTADO, the defendants, along with others
known and unknown, conspired to transmit and transmitted funds,
constituting kickback payments, from accounts inside the United
States to accounts outside of the United States.   These accounts
outside of the United States were controlled by, among others,
GONZALEZ, Associate 1, and the Gonzalez Company.   I believe that
GONZALEZ, CLARKE, and HURTADO used middlemen and intermediary
corporate entities to route these payments to GONZALEZ in order

-11-

to conceal these kickback payments.

### OVERVIEW OF THE BROKER-DEALER'S WORK FOR BANDES

24.   Starting in or around 2008, the Broker-Dealer established a group within the Broker-Dealer known as the Global Markets Group ("GMG").   The GMG primarily served institutional clients by providing fixed income trading services in the purchase and sale of foreign sovereign debt.

25.   The GMG would, at a customer's direction, locate a bond the customer wished to purchase, purchase that bond, and then resell it to the customer at a higher price.   The Broker-Dealer would retain this "mark-up."   Conversely, when selling a bond on behalf of a customer, the Broker-Dealer would purchase the bond from the customer at a below-market price and then sell that bond on the market for a higher price.   The Broker-Dealer would retain this "mark-down."

26.   In November 2010, the SEC commenced a periodic examination of the Broker-Dealer.   From November 2010 through March 2011, the SEC's staff made several visits to the firm's offices in New York, New York, to conduct the examination; the SEC's final contact with the firm in connection with conducting the examination was in or about July 2011.

### GONZALEZ MANAGED THE RELATIONSHIP WITH THE BROKER-DEALER ON BEHALF OF BANDES

27.   I have reviewed documents, including documents that the SEC obtained from the Broker-Dealer, reflecting that MARIA GONZALEZ, the defendant, managed the relationship between the Broker-Dealer and BANDES and authorized the Broker-Dealer to execute trades on behalf of BANDES.   For example:

a.   I have reviewed documents indicating that GONZALEZ had served as the Vice President of Finance or as the Executive Manager of Finance and Funds Administration of BANDES since approximately June 2008.

b.   I have reviewed Broker-Dealer documents that identify GONZALEZ as BANDES's "Authorized Trading Contact" for the Broker-Dealer.   Another BANDES employee is listed as the "Primary Trading Contact."

c.   I have reviewed an email GONZALEZ sent on or about June 4, 2009, to ALEJANDRO HURTADO, the defendant, with the

subject (translated from Spanish):[3]  "Bonds."  The email stated
(translated from Spanish):  "Hello! Enclosed please find the
portfolio that you are going to negotiate for the Vnzl-27; it has
to be valued on a daily basis to see if we can come out ahead.
It's in your hands."  On or about June 5, 2009, the following
day, HURTADO forwarded this email to TOMAS CLARKE, the defendant,
and another employee of the Broker-Dealer.  When forwarding the
email from GONZALEZ, HURTADO stated in his own email (translated
from Spanish):

Good Morning, Guys,

Here you have more work (thank God).

We can start right away, so let's talk before starting.

A big hug.

AH

        d.    I have reviewed an email HURTADO sent on or
about October 20, 2010, to GONZALEZ attaching a spreadsheet
setting forth possible bond transactions that the Broker-Dealer
could execute for BANDES.  HURTADO's email stated, in part
(translated from Spanish):  "Please look it over, like I said it
could be fast and very efficient.  If you look it over you will
be able to see how great it would be to do it."

### BANDES TRANSACTIONS GENERATED SUBSTANTIAL REVENUE
### FOR THE BROKER-DEALER

        28.    Based in part upon my review of documents obtained
from the Broker-Dealer, I have learned that between in or around
April 2009 through in or around June 2010, the overwhelming
majority of revenue generated by the GMG resulted from the
execution of bond trades for BANDES.  During this time period,
the Broker-Dealer generated over $60 million in revenue from
BANDES trading in fixed income investments, including Venezuelan
bonds.

        29.    Based in part upon my review of documents obtained
from the Broker-Dealer and trading records I have reviewed, I

_____

        [3] Translations of emails written in Spanish were prepared by
a translator who has certified that she is competent to conduct
such translations and further certified under penalty of perjury
that the translations are true and correct.

have also learned of specific securities transactions that the Broker-Dealer carried out with BANDES that generated substantial revenue for the Broker-Dealer in the form of mark-ups, including the following:

   a.   In or around late January 2010, TOMAS CLARKE, the defendant, caused the Broker-Dealer to execute at least two trades between the Broker-Dealer and BANDES for the same bonds on the same day.   In other words, BANDES sold certain bonds and then shortly thereafter purchased back those same bonds.   The result of such trades was that BANDES was left with the same bond holdings as before the trades, except that it had paid the Broker-Dealer approximately $10.5 million in mark-ups in the course of the two round-trip transactions.   Specifically:

   i.   First, on or about January 28, 2010, CLARKE caused the Broker-Dealer to purchase from BANDES bonds issued by a Venezuelan state-owned electric utility ("ELECAR") for approximately $90,673,000.   CLARKE on behalf of the Broker-Dealer then, on that same day, sold these same ELECAR bonds back to BANDES for approximately $95,953,000, resulting in a mark-up paid to the Broker-Dealer of approximately $5,280,000.

   ii.   Second, on or about January 29, 2010, the Broker-Dealer purchased from BANDES a number of ELECAR bonds for approximately $90,017,014.   On or about the same day, the Broker-Dealer then sold these same ELECAR bonds back to BANDES for approximately $95,257,014, resulting in a mark-up paid to the Broker-Dealer of approximately $5,240,000.

   b.   As described more fully below, I have reviewed documents obtained from the Broker-Dealer indicating that roughly half of the approximately $10.5 million in revenue generated by these mark-ups was designated to be paid as kickbacks to GONZALEZ.

### GONZALEZ RECEIVED KICKBACK PAYMENTS FROM BROKER-DEALER EMPLOYEES AND AFFILIATES BASED ON TRADES EXECUTED BY THE BROKER-DEALER FOR BANDES

   30.   Based in part upon my review of documents obtained from the Broker-Dealer, financial records, and emails obtained during the course of the investigation, I have learned, in substance and in part, the following:

   a.   As set forth further below, between at least in or around May 2009 through in or around August 2010, MARIA GONZALEZ, the defendant, both personally and through the Gonzalez

-14-

Company, received kickback payments from employees of the Broker-Dealer and other individuals associated with the Broker-Dealer, including TOMAS CLARKE and ALEJANDRO HURTADO, the defendants. These kickbacks were derived from revenue the Broker-Dealer generated from BANDES through executing trades for BANDES.

        b.    GONZALEZ arranged for payments to be made to herself, in part, through payments directed to the Gonzalez Company and her co-owner of the Gonzalez Company, Associate 1. These payments were made or directed by, among others, CLARKE and HURTADO, who both worked in the Miami, Florida office of the Broker-Dealer.  In turn, CLARKE and HURTADO used intermediaries, including corporate entities, to convey these payments to GONZALEZ.

### Email Correspondence Regarding Payments to GONZALEZ

        31.    I have reviewed emails obtained from the Broker-Dealer that reflect certain payments to be paid to MARIA GONZALEZ, the defendant.  These emails include the following:

        a.    On or about February 8, 2010, TOMAS CLARKE, the defendant, sent from his personal Bloomberg email account an email to ALEJANDRO HURTADO, the defendant, at HURTADO's Broker-Dealer email account, attaching a document with the file name "alejandro y economista mes de feb.xlsx" (translated from Spanish: "alejandro and the [female] economist month of Feb.") that contained several spreadsheets.

        i.    One of the spreadsheets contained rows of bond trades and columns reflecting commissions, in addition to the trading prices.

        ii.    Next to the commissions column were two additional columns, entitled "Mary" and "Miami/[Acronym for Broker-Dealer]" in which the commissions were split into two amounts for each trade.

        iii.    This entire spreadsheet, which is entitled "Economista 2," reflected $5,302,231 in commissions to "[Acronym for Broker-Dealer]/Miami" and $5,260,439 in commissions to "Mary."  The amount of kickback commissions allocated to "Mary" – $5,260,439 – included the commissions generated from the late-January 2010 ELECAR transactions described above.

        b.    On or about April 9, 2010, CLARKE sent from his Broker-Dealer email account an email to a Gmail account used by HURTADO (the "HURTADO Gmail Account").  Attached to the email

was a document with the file name "alejandro y economista mes de mar.xlsx" (translated from Spanish: "alejandro and the [female] economist month of March") that contained several spreadsheets.

       i.  One of the spreadsheets contained rows of bond trades and columns reflecting, in addition to the trading prices, commissions.

       ii. Next to the commissions column were two columns, entitled "Comisiones" and "Mary" in which the number listed as the commissions was divided in half and entered in the "Mary" column.

       iii.  This spreadsheet, which was also entitled "Economista 2," reflected $107,985 in commissions to "Mary."

     c.  On or about May 25, 2010, CLARKE sent from his Broker-Dealer account an email to HURTADO at the Hurtado Gmail Account attaching a document with the file name "alejandro y economista mes de Mayo 2010.xlsx" (translated from Spanish: "alejandro and the [female] economist month of May 2010") that contained several spreadsheets.

       i.  One of the spreadsheets contained rows of bond trades and columns reflecting, in addition to the trading prices, commissions.

       ii.  Next to the commissions column were two columns, entitled "Comisiones" and "Mary" in which the number listed as the commissions was divided in half and entered in the "Mary" column.  This spreadsheet, which was also entitled "Economista 2," reflected $108,500 in commissions to "Mary."

     32.  I have reviewed email correspondence obtained through search warrants indicating that ALEJANDRO HURTADO, the defendant, sent MARIA GONZALEZ, the defendant, spreadsheets setting forth BANDES bond trades with the Broker-Dealer, trading prices, and payments to be made to GONZALEZ.  These emails include the following:

     a.  On or about May 21, 2009, HURTADO sent from the Hurtado Gmail Account an email to GONZALEZ at a Yahoo account used by GONZALEZ (the "Gonzalez Yahoo Account"), with a "cc" to another co-conspirator ("CC-1").  The subject line stated "cuadro final abril" (translated from Spanish:  "final april graph").  The email stated (translated from Spanish):

Dear Sirs,

I am sending you here the final graph for April

Greetings

Alejandro Hurtado
[address and phone number]

Attached to the email was a spreadsheet entitled "MdAG Abril 2009.xls" (translated from Spanish: "MdAG April 2009"). "MdAG" appear to be the initials for "Maria de los Angeles Gonzalez." The attached spreadsheet contained rows of bond trades and columns reflecting, in addition to the trading prices, commissions. Next to the column reflecting these commissions was a column entitled "MdAG." That column reflected a total of $31,875.00.

      b.   Also on or about May 21, 2009, HURTADO sent from the Hurtado Gmail Account another email to GONZALEZ at the Gonzalez Yahoo Account, with a "cc" to CC-1. The subject line stated "mayo" (translated from Spanish: "May"). Attached to the email was a spreadsheet entitled "MdAG Mayo 2009.xls" (translated from Spanish: "MdAG May 2009"). The attached spreadsheet contained rows of bond trades and columns reflecting, in addition to the trading prices, commissions. Next to the column reflecting these commissions was a column entitled "MdAG." That column reflected a total of $509,250.

      c.   On or about June 23, 2009, HURTADO sent from the Hurtado Gmail account an email to GONZALEZ at the Gonzalez Yahoo Account. The subject line stated "Cuadro Junio" (translated from Spanish: "June Graph"). The email stated (translated from Spanish):

Here I am sending you the graph for June.

Please review everything, let me know of any remarks. I reviewed everything and it is very good.

I hope we continue this way and improve every day.

Kiss

AH

Attached to the email was a spreadsheet entitled "junio_incentivo-mary.xls" (translated from Spanish: "June

Incentive"). The attached spreadsheet contained rows of bond
trades and columns reflecting, in addition to the trading prices,
commissions. Next to the column reflecting these commissions was
a column entitled "Mary." That column reflected a total of
$941,366.80.

    d. On or about July 28, 2009, HURTADO sent from
the Hurtado Gmail Account an email to GONZALEZ at the Gonzalez
Yahoo Account. The subject line stated "incentivo j[u]lio"
(translated from Spanish: "July incentives"). The email stated
(translated from Spanish):

  I am sending you here the graph for July

  Forgive me for the delay, tomas [CLARKE] had already sent it
  to me.

  Kisses

  Alejandro Hurtado

Attached to the email was a spreadsheet entitled "Mary Julio
09.xlsx." The attached spreadsheet contained rows of bond trades
and columns reflecting, in addition to the trading prices,
commissions. Next to the column reflecting these commissions was
a column entitled "Mary." That column reflected a total of
$233,550.

    e. On or about February 8, 2010, HURTADO sent an
email from the Hurtado Gmail Account to GONZALEZ at a Gmail
account used by GONZALEZ (the "Gonzalez Gmail Account"). The
email stated (translated from Spanish):

  Dear Mary

  As I promised, here are the numbers to date of what has been
  done.

  Please review and later we will talk on the phone.

  Greetings

  AH

Attached to the email was a spreadsheet entitled "MARY cuadro
Enero-Febrero 2010.xls" (translated from Spanish: "Mary statement
January-February 2010"). The attached spreadsheet contained rows
of bond trades and columns reflecting, in addition to the trading

-18-

prices, commissions.  Next to the commissions column was a column
entitled "Mary."  That column reflected a total of $5,260,439.

       f.   On October 20, 2010, HURTADO sent from the
Hurtado Gmail Account an email to GONZALEZ at the Gonzalez Gmail
Account.  Attached to the email was a spreadsheet setting forth
possible bond transactions that the Broker-Dealer could execute
for BANDES.  The subject line of the email stated:  "Escenario
ELCR" (translated from Spanish:  "ELCR Scenario").  HURTADO's
email stated, in part (translated from Spanish):

    Here's the Elecr [sic] scenario

       Please look it over, like I said it could be fast and
very efficient.

       If you look it over you will be able to see how great
it would be to do it.

The attached spreadsheet set forth two possible transactions
involving "Elecar" bonds.  The spreadsheet included a column
entitled "Economista" with dollar figures - $7,890,000 and
$6,575,000, respectively - for each transaction.

### HURTADO's Payments to GONZALEZ and to the Gonzalez Company

      33.   Based in part upon my review of documents obtained
from the Broker-Dealer, I have learned, in substance and in part,
that Hurtado's Spouse and HURTADO were heavily compensated by the
Broker-Dealer as follows:

       a.   From in or around January 2009 through
in or around July 2009, Hurtado's Spouse, a Venezuelan national
residing in Florida, was paid commissions by the Broker-Dealer as
a "foreign finder."  Specifically, from in or around April 2009
through in or around July 2009, the Broker-Dealer paid Hurtado's
Spouse approximately $8 million in purported foreign finder's
fees in connection with BANDES trades.

       b.   In or around July and August 2009, the
Broker-Dealer stopped paying Hurtado's Spouse as a foreign
finder.  At or around this same time, ALEJANDRO HURTADO, the
defendant, became an employee of the Broker-Dealer.

       c.   HURTADO was not a licensed broker or trader
in the United States.  Nevertheless, according to payroll
records, in 2010, HURTADO's first full year of employment at the
Broker-Dealer, HURTADO was one of the highest compensated

employees at the Broker-Dealer, receiving approximately $4,384,616 in salary and bonus.

34.    Based in part upon my review of financial records I have reviewed during this investigation, I have learned, in substance and in part, that ALEJANDRO HURTADO, the defendant, made payments to MARIA GONZALEZ, the defendant, and the Gonzalez Company.  Specifically, I have learned the following:

a.    On or about May 28, 2009, a check for approximately $3,747 that was signed by HURTADO and drawn on a bank account controlled by HURTADO and Hurtado's Spouse, was deposited into a bank account held by GONZALEZ in Miami, Florida (the "Miami Gonzalez Account").  The memo line of the check stated "April comm."

b.    On or about July 21, 2009, HURTADO wired approximately $509,250 from an account in the United States held jointly by HURTADO and Hurtado's Spouse.  These funds were wired to a correspondent bank account in New York, New York for further transfer to an account in Switzerland held in the name of Associate 1.  As described above, Associate 1 was a co-owner of the Gonzalez Company with GONZALEZ.

c.    On or about September 1, 2009, HURTADO wired approximately $45,000 from an account in the United States to the Miami Gonzalez Account.

d.    On or about January 25, 2010, a check for approximately $20,000 that was drawn on an account held in the name of HURTADO was deposited into the Miami Gonzalez Account. The check was made payable to "Maria de los Angeles Gonzalez," with the memo line reading "LOAN." GONZALEZ's signature, which I have compared to another document signed by her, appears on the back of this check as that of the endorser.

e.    On or about February 13, 2010, a check for approximately $98,750 that was drawn on a bank account held in the name of HURTADO was deposited into the Miami Gonzalez Account.  The check was made payable to "Maria de los Angeles Gonzalez," with the memo line reading "loan Mary."

35.    In connection with the approximately $509,250 that ALEJANDRO HURTADO, the defendant, wired to an account held in the name of Associate 1 on or about July 21, 2009, described above in sub-paragraph 34(b), I have reviewed an email indicating that MARIA GONZALEZ, the defendant, directed HURTADO to wire these funds to the account held in Associate 1's name.  Specifically,

on or about July 13, 2009, an email was sent from the Gonzalez Yahoo Account to the Hurtado Gmail Account directing that HURTADO transfer $509,250 to the account held in the name of Associate 1 in Switzerland through an account in New York.  The email is signed: "Maria de Los Angeles Gonzalez."

### HURTADO REQUESTED GONZALEZ TO PAY
### HIS TAX LIABILITY FOR KICKBACKS TO HER

36.   Based on the following, I believe that ALEJANDRO HURTADO, the defendant, requested that MARIA GONZALEZ, the defendant, send to HURTADO funds sufficient to cover HURTADO's tax liability for purported income he had received from the Broker-Dealer that he passed on to GONZALEZ as kickback payments:

a.   On or about August 13, 2010, HURTADO sent an email from the Hurtado Gmail Account to the Gonzalez Gmail Account.  The email stated (translated from Spanish):  "Please review the attachments.  I will await your comments and revisions."

b.   Attached to the email was a document entitled (translated from Spanish):  "Transactions: 2009/2010."  The document contained columns labeled (translated from Spanish):  "Month," "Amount," and "Item."

i.   Listed for April is the amount $31,875.00.  This amount is identical to the amount referenced in the "MdAG Abril 2009" spreadsheet referenced above in sub-paragraph 32(a).

ii.   Listed for May is the amount $509,250.00.  This amount is identical to the amount referenced in the "MdAG Mayo 2009" spreadsheet referenced above in sub-paragraph 32(b).  This amount is also identical to the amount transferred on or about July 21, 2009 to Associate 1 as described above in sub-paragraph 34(b).

iii.  Listed for June is the amount $941,366.80.  This amount is identical to the amount referenced in the "junio_incentivo-mary" spreadsheet referenced above in sub-paragraph 32(c).

c.   The attached document referenced a subtotal of $2,028,541.80.  It further referenced a "Tax Bracket" of "35%" and a total of $709,989.63 for "Reinbursment [sic] Tax."

d.    Also attached to this email was a typed bank transfer instruction to wire $709,989.63, the above-referenced tax-reimbursement amount, from an account held in the name of the Gonzalez Company to an account in Switzerland held in the name of a entity affiliated with HURTADO (the "Hurtado Company").  This wire instruction included a signature line for GONZALEZ to sign on behalf of the Gonzalez Company.

e.    On or about August 14, 2010, the following day, a reply to the above email was sent from the Gonzalez Gmail Account to the Hurtado Gmail Account.  The email stated, in part (translated from Spanish):

> Here are all the instructions, it seemed to me that everything is ok.  Now I understand your bad mood when you spoke to the accountant from the shock you nearly fell and cracked your ribs, with those taxes anyone would have had a heart attack. That Uncle Sam is baaaaaad.  You work and he charges.  He makes you crazy.

f.    I have reviewed bank records indicating that several days later, on or about August 19, 2010, $709,989.63 was, in fact, transferred from the Gonzalez Company account to the Hurtado Company Account, as referenced in the transfer instruction that HURTADO had sent GONZALEZ.

### CLARKE MADE PAYMENTS TO GONZALEZ AND TO THE GONZALEZ COMPANY

37.    My review of documents obtained during the course of the investigation reveals that TOMAS CLARKE, the defendant, also routed payments to MARIA GONZALEZ, the defendant.  CLARKE utilized a Panamanian company he controlled, ETC Investments[4] to direct certain of these payments to GONZALEZ.

38.    My review of documents obtained from the Broker-Dealer and other financial records reveals the following:

a.    TOMAS CLARKE, the defendant, joined the Broker-Dealer in or around late 2008 and served as a Senior Vice President in the GMG.  In CLARKE's capacity as Senior Vice

---

[4] Based on email and real estate records I have reviewed, it appears that TOMAS CLARKE's wife's first name begins with "E.", and thus "ETC Investments" bears the combined initials of CLARKE's wife's first name and the name "Thomas Clarke".  Other evidence that CLARKE controls ETC Investments is set forth below.

President in the GMG, CLARKE participated in the Broker-Dealer's business involving BANDES.

b.   Over the course of the Broker-Dealer's relationship with BANDES, the Broker-Dealer paid several million dollars in purported finder's fees to both a Panamanian resident ("Associate 2") and a Panamanian Company, ETC Investments, of which Associate 2 was designated as president, including the following:

i.   On or about September 29, 2009, the Broker-Dealer in New York, New York, sent two wire transfers in the amounts of approximately $2,002,983 and $2,048,206, respectively, to an account held by ETC Investments in Switzerland.

ii.   On or about January 21, 2010, the Broker-Dealer issued two checks in the amounts of approximately $2,829,585 and $1,920,531 to ETC Investments.  These checks were issued from the Broker-Dealer in New York, New York, and, as reflected on stamps appearing on the back of the checks, were deposited into a Swiss bank.

iii. On or about May 4, 2010, the Broker-Dealer in New York, New York, issued a check for approximately $2,500,000 to Associate 2.

iv.   On or about May 18, 2010, this check was deposited into an ETC Investments account in Switzerland.

39.   Notwithstanding Associate 2's designation as "president" of ETC Investments, I believe that TOMAS CLARKE, the defendant, had actual control of ETC Investments based on the following:

a.   I have reviewed documents reflecting that CLARKE maintained a power of attorney for ETC Investments.

b.   I have reviewed correspondence between CLARKE and another individual ("Associate 3"), demonstrating CLARKE's efforts to open a bank or brokerage account in the name of ETC Investments.

c.   As described above, the initials "ETC" are a combination of CLARKE's wife's first name and the name "Thomas Clarke".

-23-

40.    Based on documents I have reviewed, I also believe that TOMAS CLARKE, the defendant, made payments to the Gonzalez Company through ETC Investments.  For example, I have learned that:

a.    On or about April 13, 2010, April 30, 2010, and August 4, 2010, Associate 3 sent emails to CLARKE attaching instructions requiring a signature to authorize transfers from ETC Investments to a Gonzalez Company account in Switzerland.  These transfer instructions were in the amounts of $833,488.30, $700,000, and $900,000, and were described in the instructions as loans.

b.    At least two of the transfers identified above in subparagraph 40(a) took place.  Specifically, I have reviewed bank records reflecting the following:

i.    On or about April 19, 2010, approximately $883,488 was wired from an ETC Investments account in Switzerland to a Gonzalez Company account in Switzerland.

ii.    On or about May 6, 2010, approximately $700,000 was wired from an ETC Investments account in Switzerland to a Gonzalez Company account in Switzerland.

c.    On or about May 24, 2010, Associate 3 sent an email to CLARKE attaching for CLARKE's signature an authorization to transfer $1,550,000 from an ETC Investments account to another account held at the same Swiss bank (the "Intermediary Swiss Account").  Then, on or about June 4, 2010, bank records reflect that $1,550,000 was transferred from the Intermediary Swiss Account to a Gonzalez Company account in Switzerland.

### GONZALEZ RECEIVED AT LEAST $3.6 MILLION IN KICKBACKS

41.    Documents I have reviewed indicate that MARIA GONZALEZ, the defendant, received at least $3.6 million in kickbacks.  The documents I am relying on include the following:

a.    The document ALEJANDRO HURTADO, the defendant, emailed to GONZALEZ on or about August 13, 2010, described above in paragraph 36, in connection with HURTADO's tax liability, in which HURTADO referenced a sub-total of $2,028,541.80 that had been sent to GONZALEZ; and

b.    Records, described above in sub-paragraph 40(b) reflecting that (i) $883,488 was wired from ETC Investments to the Gonzalez Company on or about April 19, 2010, and (ii)

-24-

$700,000 was wired from ETC Investments to the Gonzalez Company on or about May 6, 2010.

### GONZALEZ RECEIVED FUNDS IN A PERSONAL ACCOUNT IN THE UNITED STATES FROM GONZALEZ COMPANY ACCOUNTS OVERSEAS

42.   I have reviewed bank records for the Miami Gonzalez Account.  These records reflect that MARIA GONZALEZ, the defendant, received funds into the Miami Gonzalez Account that were transferred from accounts outside of the United States held by the Gonzalez Company.  For example:

a.   On or about May 8, 2009, GONZALEZ received into the Miami Gonzalez Account approximately $42,000 that had been transferred from an account held in the name of the Gonzalez Company in Switzerland.

b.   On or about November 9, 2010, GONZALEZ received into the Miami Gonzalez Account approximately $72,610 that had been transferred from an account held in the name of the Gonzalez Company in Switzerland.

c.   On or about September 14, 2011, GONZALEZ received into the Miami Gonzalez Account approximately $42,600 that was transferred from an account held in the name of the Gonzalez Company in Switzerland.

WHEREFORE, deponent prays that warrants be issued for the arrests of the above-named individuals and that they be arrested and imprisoned, or bailed, as the case may be.

Lilian Perez
Special Agent
Federal Bureau of Investigation

Sworn to before me this
17th day of March, 2013

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

RONALD L. ELLIS
United States Magistrate Judge
Southern District of New York

-25-